**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No.  **SA CV 25-1905-JFW(DTB)** | Date:  September 3, 2025 |

Title:    Reza Eric Nouri -v- Jennifer Herrera

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Shannon Reilly | None Present |
| Courtroom Deputy | Court Reporter |

| | |
|---|---|
| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
| None | None |

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING APPLICATION FOR A TEMPORARY RESTRAINING ORDER OR IN THE ALTERNATIVE PRELIMINARY INJUNCTION [filed 8/27/25; Docket No. 5]

    On August 27, 2025, Petitioner Reza Eric Nouri ("Petitioner") filed an Application for a Temporary Restraining Order or in the Alternative Preliminary Injunction ("Application").  On August 28, 2025, Respondent Jennifer Herrera ("Respondent") filed her Opposition.[1]  On September 1, 2025, Petitioner  filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for September 8, 2025 is hereby vacated and the matter taken off calendar. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.    Factual and Procedural Background**

    Petitioner entered the United States from Iran on June 19, 1978, and acquired lawful permanent residence status on March  6, 1987.  Petitioner's wife is a United States citizen. Petitioner and his wife have been together for twenty-two years, and they married in 2013. Petitioner's entire family, including his two step-children, are United States citizens.  According to Yasmine Choroomi, M.D. ("Choroomi"), one of Petitioner's step-children, Petitioner is the caregiver

---

[1] In his Application, Petitioner seeks a temporary restraining order ("TRO") or, in the alternative, a preliminary injunction.  Because Respondent had notice and an opportunity to respond, the parties have briefed the issues extensively, and the standard for a TRO and a preliminary injunction are the same, the Court will treat Petitioner's Application as a motion for preliminary injunction.

for his wife, who has a chronic history of severe psychiatric illness. Choroomi states that "[n]o one in our family can replace [Petitioner's] role" with respect to caring for his wife, and the tasks he performs on a regular basis, which include assisting with her bathing, hygiene, and household needs, preparing her meals, administering her medication, driving her to medical appointments, and managing the household's finances.

On May 10, 2010, Petitioner was convicted in the United States District Court for the Southern District of New York for conspiracy to commit securities fraud, wire fraud, and commercial bribery. Petitioner was sentenced to eighteen months incarceration.

On August 22, 2016, a final order of removal was issued against Petitioner pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act based on his conviction of an aggravated felony. However, the immigration judge also granted Petitioner's request for deferral of removal under the "Convention Against Torture" ("CAT") after Petitioner demonstrated that if he was returned to Iran, it was more likely than not that he would be tortured based on his religious faith and the political background of his family members.[2] The government waived its right to appeal, and on October 28, 2016, Petitioner was released on an Order of Release on Supervision ("OSUP"). Since his release, Petitioner has fully complied with his OSUP. The OSUP required Petitioner to check in with United States Immigration and Customs Enforcement ("ICE") periodically, beginning on December 15, 2016, and Petitioner has checked in with ICE at least ten times since his release. Petitioner has also updated his address changes and has remained willing to complete applications for travel documents to a third country, although ICE has never asked him to complete such documents or otherwise taken action to pursue third country removal.

On August 27, 2025, Petitioner attended his regularly scheduled check-in with ICE in Santa Ana, California. At the check-in, Petitioner was taken into custody by ICE and issued a Notice of Revocation of Release (the "Notice"). The Notice claims that the decision to re-detain Petitioner "has been made based on a review of your immigration and criminal history, and a change in circumstances which allows ICE to remove you to an alternative country" and claims it retains authority to detain Petition under 8 C.F.R. § 241.4. ICE did not provide Petitioner with an opportunity to respond to the reasons for the revocation and did not provide him an opportunity to submit evidence or information demonstrating that there is no significant likelihood Petitioner will be removed in the reasonably foreseeable future. According to Petitioner, ICE is fully aware that his removal is not significantly likely in the reasonably foreseeable future because Respondent confirmed to Petitioner's counsel that Petitioner is "not getting removed anytime soon."

On August 27, 2025, Petitioner filed a Petition for Writ of Habeas Corpus (the "Petition"), which alleges that ICE's revocation of his OSUP and his re-detention are unlawful. Petitioner alleges causes of action for: (1) re-detention in violation of 8 C.F.R. § 241.13(i)(2); (2) unconstitutional prolonged, post-removal detention; and (3) violation of statutory due process for removal to third country. On August 27, 2025, Petitioner filed his Application seeking a TRO or, in the alternative, preliminary injunction enjoining the legal effect of the Notice and ordering Petitioner's immediate release on an OSUP.

On August 28, 2025, the Court issued an Order Setting a Briefing Schedule on Petitioner's

---

[2] Petitioner is Christian and was baptized on January 16, 2016. Petitioner's father is Baha'i and his mother is Jewish. Petitioner's father worked in a high position as an inspector general for the Ministry of Finance under the Shah of Iran from 1967 through 1978.

Application and enjoining Respondent from Removing Petitioner to Iran or Any Third Country Until the Court Issues a Ruling on Petitioner's Application (the "August 28, 2025 Order").

On August 28, 2025, Petitioner personally served the Petition, the Application, and other related documents on Respondent.  In addition, on August 28, 2025, Petitioner filed Supplemental Evidence in Support of Petitioner's Application (the "Supplement").  The Supplement contains the declaration of Henry Nouri ("Nouri"), Petitioner's brother and a United States citizen.  In his declaration, Nouri states that he was advised in a telephone call from Petitioner at approximately 10:28 a.m. EDT, on August 28, 2025, that since his detention the previous day, he had been moved from Santa Ana, California, to the Metropolitan Detention Center ("MDC") in Los Angeles, California.  Petitioner also told Nouri that a female officer served Petitioner with a Form I-294, Warning to Alien Ordered Removed or Deported ("Form I-294").  When Petitioner stated he would not and could not sign the form without first consulting with his attorney, he was told that he had no right to speak with his attorney before signing it and that he had to sign the form immediately.  When Petitioner refused to sign the Form I-294, three officers forcibly placed him in handcuffs and physically pressed his fingerprint on the document against his will.  Petitioner also advised Nouri that he was denied a copy of the Form I-294.

On August 28, 2025, Respondent filed her Opposition.  On September 1, 2025, Petitioner filed his Reply.  In his Reply, Petitioner "does not dispute that ICE could put additional conditions on his release such as an ankle monitor, more intense reporting requirements, or other conditions short of full-scale detention."

## II.     Legal Standard

The standard for issuing a TRO and preliminary injunction under Federal Rule of Civil Procedure 65 is the same.  *Six v. Newsom*, 462 F. Supp. 3d 1060, 1067 (C.D. Cal. 2020) (citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that a TRO and preliminary injunction involve "substantially identical" analysis).  Like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Under *Winter*, a plaintiff seeking a TRO must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction."  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,* 758 F.3d 1069, 1071 (9th Cir. 2014) (*citing Winter*, 555 U.S. at 20).  Courts in this circuit also employ "an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the Winter standard" (*Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021)), in which the four *Winter* elements are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under this approach, a TRO may be warranted where there are "'serious questions going to the merits' and a hardship balance . . . tips sharply toward the plaintiff," and so long as the other *Winter* factors are also met.  *Id.* at 1132.

The Ninth Circuit distinguishes between "mandatory" and "prohibitory" injunctions.  *Hernandez v. Sessions*, 872 F.3d 976, 997–98 (9th Cir. 2017).  Prohibitory injunctions maintain the

status quo, preventing further constitutional violations. *Id.* at 997. By contrast, mandatory injunctions go further, ordering "a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996)). A mandatory injunction "'goes well beyond simply maintaining the status quo [and is thus] . . . particularly disfavored.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). Accordingly, the Ninth Circuit has held that mandatory injunctions "should not be approved in the absence of a risk of 'extreme or very serious damage.'" *Hernandez*, 872 F.3d at 997 (quoting *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879). Mandatory injunctions are most likely to be appropriate when "the status quo . . . is exactly what will inflict the irreparable injury upon complainant." *Id.* (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp*., 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).

### III. Discussion

In his Motion, Petitioner seeks a TRO or, in the alternative, preliminary injunction enjoining the legal effect of the Notice and ordering Petitioner's immediate release on an OSUP. Petitioner argues that the revocation of Petitioner's OSUP is unlawful because ICE did not identify any factual "change in circumstances" that makes his removal significantly likely in the reasonably foreseeable future and, indeed, Respondent's admission to Petitioner's counsel that Petitioner is "not getting removed any time soon" wholly undermines any claim that his removal is significantly likely in the reasonably foreseeable future. Petitioner also argues that after ICE revoked Petitioner's OSUP, ICE did not follow any of the procedures set forth in 8 C.F.R. § 241.13(i)(3). In her Opposition, Respondent argues that Petitioner's Application should be denied because Petitioner received a Notice that explained the basis for ICE's decision to revoke his release "based on a review of your immigration and criminal history, and a change in circumstances which allows ICE to remove you to an alternate country" and, as result, Petitioner's detention pursuant to his final removal order is lawful.

#### A. Petitioner Has Demonstrated A Likelihood of Success on the Merits

##### 1. Legal Standard

Under the Immigration and Nationality Act ("INA"), when an alien is ordered removed, the government ordinarily must secure the alien's removal from the United States within a period of ninety days, known as the "removal period." 8 U.S.C. § 1231(a)(1)(A). Certain aliens ordered removed may be detained beyond the ninety-day removal period, including those who are removable for certain criminal offenses, those determined to be a risk to the community, or those unlikely to comply with the order of removal. 8 U.S.C. § 1231(a)(6). However, in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001), the Supreme Court held that the post-removal-period detention scheme contains "an implicit 'reasonable time' limitation." In other words, "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." *Id.* at 689. The Supreme Court reasoned that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," because "[t]he Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law'" and the Supreme Court made clear that aliens, whether their presence is lawful, unlawful, temporary, or permanent, enjoy due process constitutional protections. *Id*. at 690. Indeed, "[f]reedom from imprisonment – from government custody,

detention, or other forms of physical restraint – lies at the heart of the liberty that Clause protects." *Id.*

If an alien cannot be removed to their country of origin, federal regulations require ICE to release them from detention on an OSUP if there is no significant likelihood that the alien will be removed in the reasonably foreseeable future. *See* 8 C.F.R. § 241.13(g)–(h); *see also Zadvydas*, 533 U.S. at 699–700 ("[I]f removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute"). In this case, although Petitioner was ordered removed to Iran, his deferral of removal under CAT precluded Respondent from removing Petitioner to Iran, and Petitioner was released on an OSUP on October 28, 2016.

Once ICE releases an alien on an OSUP, "ICE's ability to re-detain that noncitizen is constrained by its own regulations." *See Roble v. Bondi*, 2025 WL 2443453 (D. Minn. Aug. 25, 2025) (finding that ICE had illegally re-detained the petitioner and ordering his immediate release where the petitioner had been ordered removed to Somalia but his deferral of removal under CAT precluded the government from removing him to Somalia and the government failed to demonstrate that there was a significant likelihood that he may be removed in the reasonably foreseeable future). Specifically, ICE may re-detain an alien released on an OSUP "if, on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2); *see also Nguyen v. Hyde*, __ F.Supp. 3d __, 2025 WL 1725791, *3 (D. Mass. June 20, 2025) (concluding that this "case is not about ICE's authority to detain in the first place upon issuance of a final order of removal . . . This case is about ICE's authority to *re-detain* [the petitioner] after he was issued a final order of removal, detained, and subsequently released on an OSUP. The DHS regulation 8 C.F.R. § 241.13(i), applies to noncitizens in [this] situation") (emphasis in the original). In addition, if ICE elects to revoke an alien's release under 8 C.F.R. § 241.13(i)(2), the alien must "be notified of the reasons for revocation of his or her release," and ICE must "conduct an initial informal interview promptly after the alien's return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). At that interview, the alien "may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future." *Id.*

The Court acknowledges that "[t]he plain language of § 241.13(i)(2), does not allow a court, in the first instance, to make an individualized finding that a changed circumstances has occurred." *Hoac v. Becerra*, 2025 WL 1993771 (E.D. Cal. July 16, 2025). Instead, to the extent ICE claims that it made such a determination, the court should review that claim in light of the factors set out in 8 C.F.R. § 241.13(f), "instructing ICE on how it should make such a determination." *Nguyen*, __ F.Supp. 3d __, 2025 WL 1725791, at *3. The Section 241.13(f) factors include, but are not limited to:

> [T]he history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

*Id.* (*citing* 8 C.F.R. § 241.13(f)).

## 2. Petitioner is Likely to Succeed on the Claims Alleged in His Petition

The Court concludes that Petitioner has demonstrated a likelihood of success on the merits. ICE's regulations require that when an alien is notified of a revocation of release, the "reasons" for that revocation must be stated in the notification. *See* 8 C.F.R. § 241.13(i)(3). In this case, the Notice given to Petitioner asserts in conclusory fashion that the decision to re-detain Petitioner in ICE custody "has been made based on a review of your immigration and criminal history, and a change in circumstances which allows ICE to remove you to an alternate country." Because the language of the Notice is not individualized to Petitioner, it "provides zero reasons as to *what* changed circumstances exist such that [Petitioner's] removal is now significantly likely in the reasonably foreseeable future." *Roble*, 2025 2443453, at *3 (emphasis in the original). The Notice does not state, for example, that ICE had received or was seeking a travel document for Petitioner, or even that ICE was attempting to find a third country to accept Petitioner. *See, e.g., Chavez Barrios v. Ripa*, 2025 WL 2280485, at *6 (S.D. Fla. Aug. 8, 2025); *Tran v. Baker*, 2025 WL 2085020, at *4–5 (D. Md. July 24, 2025). Although ICE's regulations require that an alien will have an opportunity to "respond to the reasons for revocation stated in the notification" during the initial informal interview after re-detention[3] (8 C.F.R. § 241.13(i)(3)), Petitioner cannot be expected to "respond to the reasons for revocation stated in the notification" when the Notice does not actually state any reasons for revocation. *Id.* (finding in a similar circumstance that "[n]ot only does this scenario border on the Kafkaesque; it is also contrary to the law").

In addition, Petitioner has demonstrate that Respondent has failed to show a change in circumstances such that there is now a significant likelihood Petitioner will be removed in the reasonably foreseeable future. *See, e.g., Hernandez Escalante v. Noem*, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) (concluding that the "regulations clearly indicate, upon revocation of supervised release, it is [ICE's] burden to show a significant likelihood that the [noncitizen] may be removed"); *Nguyen*, __ F.Supp. 3d __, 2025 WL 1725791, at *3 n.2. Indeed, any argument to the contrary by Respondent is completely undermined by her admission to Petitioner's counsel that Petitioner was "not getting removed any time soon." Moreover, in her Opposition, Respondent fails to provide information regarding the purported "change in circumstances" and, instead, makes the frivolous argument that "[t]he world has changed since 2016 in many respects, and the government's belief that ICE can remove Petitioner to an alternate country at this juncture is sufficient as a stated reason for its decision to revoke the release." Opposition, 7:4-7. However, ICE's "belief" is not a factual change in circumstances that makes Petitioner's removal more likely in the reasonably foreseeable future, and such conclusory arguments without any factual, legal, or

---

[3] Petitioner alleges, and Respondent does not dispute, that Petitioner was not provided with an initial informal interview or given an opportunity to respond to the purported reasons for his revocation as required by 8 C.F.R. § 241.13(i)(3). As a result, the Court concludes that Respondent's failure to provide Petitioner with the requisite informal interview further demonstrates Petitioner's likelihood of success on the merits. *See Wing Nuen Liu v. Carter*, 2025 WL 1696526, at *2 (D. Kan. Jun. 17, 2025) (finding "that officials did not properly revoke petitioner's release pursuant to Section 241.13" because "and most obviously . . . petitioner was not granted the required interview upon the revocation of his release"); *Sering Ceesay v. Kurzdorfer*, 2025 WL 1284720, at *21 (W.D.N.Y. May 2, 2025) (finding petitioner "was not afforded even minimal due process" protections when ICE failed to provide petitioner an informal interview upon his re-detainment).

evidentiary support are wholly insufficient to demonstrate a "change in circumstances." *See, e.g.,* Nguyen, __ F.Supp. 3d __, 2025 WL 1725791, at *4 (rejecting the government's argument that changed circumstances made the petitioner's removal significantly likely in the foreseeable future because ICE was processing a travel document request for the petitioner because the government "provided scant information" about "what concrete steps ICE has taken to process [the petitioner's] particular travel document" and the anticipated outcome of that request); *Hoac v. Becerra*, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (rejecting the government's argument that ICE's intent to apply for a travel document for the petitioner constituted changed circumstances because the government failed to provide "any details about why a travel document could not be obtained in the past, nor have they attempted to show why obtaining a travel document is more likely this time around").

Accordingly, the Court concludes that Petitioner has demonstrated that the likelihood of success on the merits factor weighs in his favor.

### B. Petitioner Has Demonstrated the Likelihood of Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (citation omitted). In addition, the "Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Diaz v. Kaiser*, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (*quoting Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). In her declaration, Choroomi, Petitioner's step-daughter, states that he is the primary caregiver for his wife who has a chronic history of severe psychiatric illness. Moreover, it is beyond dispute that Petitioner would face irreparable harm if he was removed to a third country. *See, e.g., A.A.R.P. v. Trump*, 605 U.S. __, 145 S. Ct. at 1364, 1367 (2025) (holding that detainees with pending habeas petitions facing removal under Alien Enemies Act faced "an imminent threat of severe, irreparable harm").

Accordingly, the Court concludes that Petitioner has demonstrated that the likelihood of irreparable harm factor weighs in his favor.

### C. The Balance of Equities and the Public Interest Factors Weigh in Favor of Petitioner

The last two *Winter* factors – the balance of the equities and public interest analyses – merge when the government is the opposing party. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (*citing Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Just as the public has an interest in the orderly and efficient administration of this country's immigration laws, . . . the public has a strong interest in upholding procedural protections against unlawful detention." *Vargas v. Jennings*, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020) (internal quotation omitted).

In this case, Petitioner has demonstrated that he is unlawfully detained in violation of his due process rights and is suffering the harms of immigration detention. On the other hand, the burden on Respondent in releasing Petitioner from his detention is minimal, especially considering

Petitioner's compliance with all of the requirements of the OSUP, his regular check-ins with ICE since his release from detention on October 28, 2016, his familial ties to the Los Angeles area, and his role as primary caretaker for his wife. Petitioner has also agreed that ICE "could put additional conditions on his release such as an ankle monitor, more intense reporting requirements, or other conditions short of full-scale detention."

In addition, the Court concludes that there is nothing in the record to demonstrate that releasing Petitioner would impede Respondent's ability to remove him if the necessary travel documents are obtained. Moreover, the Ninth Circuit has recognized that "[t]he costs to the public of immigration detention are 'staggering,'" and that "[s]upervised release programs cost much less by comparison." *Hernandez v. Sessions*, 872 F.3d 976, 996 (ith Cir. 2017). As a result, the Court concludes that the government's cost of Petitioner's continued detention is not in the public interest in light of Petitioner's compliance with his OSUP, consistent attendance at scheduled ICE check-ins, his caretaking responsibilities, and his agreement that ICE could put additional conditions on his release. *See Vargas v. Jennings*, 2020 WL 5074312, at *4.

Accordingly, the Court concludes that Petitioner has demonstrated that balance of equities and the public interest factors weigh in his favor.

### D.      Releasing Petitioner From Custody Preserves the Status Quo

In his Application, Petitioner asks the court to release him from detention. The status quo *ante litem* is "the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir, 2000) (*quoting Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963)); *see Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (holding that "the 'status quo' refers to the legally relevant relationship between the parties before the controversy arose") (*citing McCormack v. Hiedeman*, 694 F.3d 1004, 1020 (9th Cir. 2012)). In this case, Petitioner was released on an OSUP on October 28, 2016, and remained released until he was re-detained by the government on August 27, 2025. Because Petitioner is challenging his re-detainment, the last uncontested status of Petitioner was before he was re-detained on August 27, 2025. *See Doe v. Becerra*, 2025 WL 691664, *2 (E.D. Cal. Mar. 3, 2025) ("It is questionable whether that status quo is properly considered to be detention when the Government suddenly took an allegedly unconstitutional action in rearresting Petitioner without a hearing"); *Domingo-Ros v. Archambeault*, 2025 WL 1425558, at * (S.D. Cal. May 18, 2025) (granting an injunction for the petitioners who sought a "probationary injunction" to "preserve the status quo preceding this litigation – their physical presence in the United States free from detention"); *Abrego Garcia v. Noem*, 777 F.Supp. 3d 501, 516 (D. Md. Apr. 6, 2025) (finding that the petitioner "request[ed] relief designed to re[s]tore the status quo ante . . . to return him to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to [the Terrorism Confinement Center in El Salvador]"); *Pinchi v. Noem*, 2025 WL 1853763, at *3 (N.D. Cal. Jul. 4, 2025) (finding that the "moment prior to the Petitioner's likely illegal detention" is the status quo).

Accordingly, the Court finds Petitioner's immediate release is required to return him to the status quo.

### E.      Bond

Rule 65(c) provides that a court "may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65( c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (*quoting Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. (citation omitted). As a result, the mandatory language of Rule 65(c) does not "absolve[ ] the party affected by the injunction from its obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). In this case, Respondent has not demonstrated any likelihood of harm if the Court grants the requested relief, and has not requested a bond if that relief is granted. In addition, a bond would pose a hardship on Petitioner.

Accordingly, the Court therefore exercises its discretion and waives the bond requirement under Rule 65(c).

## IV.     Conclusion

For all of the foregoing reasons, Petitioner's Applications for a temporary restraining order and a preliminary injunction are **GRANTED**. Respondent is **ORDERED** to immediately release Petitioner from custody subject to and in accordance with the conditions of his pre-existing OSUP. Respondent is **ENJOINED** and **RESTRAINED** from re-detaining or removing Petitioner to Iran or any third country without notice and an opportunity to be heard.

IT IS SO ORDERED.